UNITED STATES of America and United States Postal Service, Plaintiffs,

v.

Harold P. WEINGOLD, an individual, Helen Archer, Inc. a New York corporation, Future Forecasters Corp., a New Jersey corporation, Holy Trinity Society, Inc., a Delaware corporation, Winners' Network Inc., a New York corporation, Fight Back International, Inc., a New Jersey corporation, Paul Zax Enterprises, Inc., a New York corporation, and Consumer's Depot, Corp., a New York corporation, Defendants.

Civ. A. No. 94–127 (WGB).

United States District Court, D. New Jersey.

March 4, 1994.

U.S. Attorney's Office by Robert M. Hanna, Asst. U.S. Atty., Newark, NJ, for plaintiffs, United States of America.

Robert DeMura, Newark, NJ, for U.S. Postal Service.

Levine & Dembia by Michael L. Levine, Cranford, NJ, for defendants.

## OPINION

BASSLER, District Judge:

### I. INTRODUCTION

The United States of America and the United States Postal Service have applied to this Court for a preliminary injunction under 39 U.S.C. § 3007, 18 U.S.C. § 1345 and Fed.

R.Civ.P. 65. The Court has received papers submitted in support of the application by Robert M. Hanna, A.U.S.A., and papers submitted in opposition by Michael L. Levine, Esq., counsel for the defendants, Harold P. Weingold, Helen Archer, Inc., Future Forecasters Corp., Holy Trinity Society, Inc., Winners' Network, Inc., Fight Back International, Inc., Paul Zax Enterprises and Consumer's Depot Corporation.

The Court has both subject matter jurisdiction over this matter under 18 U.S.C. § 981 and 28 U.S.C. §§ 1331, 1339, 1345 and 1355 and personal jurisdiction over the parties involved. The District of New Jersey is the proper venue pursuant to 18 U.S.C. § 981(h), 28 U.S.C. § 1391(b) and 39 U.S.C. § 3007(a).

The applicants have complied with Local Rule 12 A, by submitting a Verified Complaint as well as the Affidavit of United States Postal Inspector, George R. McCarthy, showing that the application qualifies for emergency consideration and should not be heard as an ordinary motion.

On January 24, 1994, the Court entered an Order to Show Cause with Temporary Restraints and an Order for Expedited Discovery, by consent of the parties. On January 31, 1994, the Court entered an Order modifying the Consent Order to Show Cause keeping the restraints in full force and scheduling a preliminary injunction hearing for February 15, 1994.

On February 16, 1994, the Government concluded its case, after having introduced the following witnesses: (1) Neil Schorr; (2) Postal Inspector, George McCarthy; (3) Barrington Illinois Police Chief, Edgar W. Fair; (4) Dr. Paul Shaman; (5) Neil Cofino; (6) Dr. William George Roll; (7) Sister Mary T. Salermo; (8) Darren Burton; (9) Salvatore Bascellaro; (10) James Monagle; and (11) Joseph Sinopoli. On February 25, 1994, the defendants concluded their case, having called the following witnesses to testify on their behalf: (1) Dr. Edward D. Weinberger; (2) John R. Dalnes; (3) Helen Archer; (4) Mary Ray; (5) Defendant, Harold P. Weingold; and (6) Norman Tim. The Court en-

tertained closing arguments from counsel on February 28, 1994.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact and conclusions of law:

### A. Findings of Fact

1. Defendant, Harold P. Weingold and the seven corporate defendants, are engaged in the business of direct mail marketing. (February 18, 1994 Stipulation of Facts ("Stip. of Facts"), ¶ 1). Using mailing lists, Weingold, who holds a Ph.D. in psychology, operating through his mail order company, Tower Mail Company, targets consumers by sending through the mail what is called a "solicitation." If customers respond to any of Weingold's solicitations by sending the requested fee, the consumer receives what is called in the trade, a "fulfillment." (Stip. of Facts, ¶ 3).

2. This action was brought by the United States Postal Service under 39 U.S.C. § 3007 and by the United States Government under 18 U.S.C. § 1345, against Weingold, individually and his seven corporations, alleging that the defendants created and implemented 11 separate mail fraud schemes.

3. The Government's investigation was prompted by numerous complaints and inquiries from consumers who received and responded to promotions and solicitations from the defendants' various businesses.

4. The State of New Jersey, Department of Consumer Affairs has also received numerous complaints and inquiries concerning defendants' solicitations and also initiated an investigation to determine whether defendants violated various state statutes. According to Barbara Ferris, an investigator with the New Jersey Division of Consumer Affairs, their investigation of Dr. Weingold began in 1990.

5. Defendant, Harold P. Weingold, is the principal in and controls the acts and practices of the seven named corporate defendants, Helen Archer, Inc., Future Forecasters Corp., Holy Trinity Society, Inc., Winners'

Network, Inc., Fight Back International, Inc., Paul Zax Enterprises and Consumer's Depot Corporation. The corporate defendants have no employees. Weingold reviewed and approved each of the solicitations prior to the first mailing to potential customers. (Stip. of Facts, ¶ 8).

6. Defendants bring their service and product promotions to the public by means of direct mail solicitations. These promotions include: (a) psychic readings, good luck and mystical pendants, using the trade styles "Helen Archer," "Uri Giller," "Future Forecasters," and "Holy Trinity Society"; (b) lottery devices and sweepstakes, using the trade styles "Winners' Network," "Pot'O Gold" and "Paul Zax, Jr."; and (c) awards and solicitations in the guise of delivery notices using the business trade styles "Consumer's Depot" and "Fifth Avenue Creations." (McCarthy Aff., ¶ 3).

7. Defendants have used the following addresses to receive mail responding to their promotions: (a) 434 Ridgedale Avenue, Dept. 11–188, East Hanover, NJ 07936; (b) 117 W. Mt. Pleasant Avenue, Suites 127 and 132, Livingston, NJ 07039; and (c) 627 Eagle Rock Avenue, Suites 102 and 105, West Orange, NJ 07052. These addresses belong to three separate mail-receiving agencies. (McCarthy Aff., ¶ 4).

### The Helen Archer Promotion

8. Defendant, Helen Archer, Inc., is a corporation organized and doing business under the laws of the State of New York. Defendant Weingold is the principal of Helen Archer, Inc. and uses the business trade name of Helen Archer to solicit money and/or property through the mails. (McCarthy Aff., ¶ 6).

9. Helen Archer is a reputed psychic living in Florida. As the principal of Archer Astrology Inc. she entered into a management agreement with Helen Archer, Inc. ("HAI"). (Gov.Ex. 12). Under this agreement Archer Astrology Inc. ("AAI") retained the services of Helen Archer, Inc., "as the exclusive marketing and financial consultant to AAI, for all products marketed by HAI." The agreement was signed by the defendant Weingold as Paul Zax, Jr.

10. Defendants' "Helen Archer" psychic reading solicitations offer a guarantee that the recipient will receive large sums of money by purchasing Defendants' promotional materials. The solicitations represent that the consumers' names came to the defendants through means other than a commercial mailing list. The pre-printed mail solicitations represent that a psychic, Helen Archer, had a vision of the recipient and guarantees that responding consumers will be given "lucky" numbers that will allow them to win their state lottery. The promotion solicits $20.00 from the recipient for a so-called "private phone number" to enable the recipient to make a "free call," in order to receive the "lucky numbers." (*See* Gov.Exs. 1, 1A and 1B).

11. Excerpts from the "Helen Archer" promotion solicitation state as follows [1]:

Last night I had a vision about you. It was very powerful. Very vivid. *I know for a fact* you had won a very large cash prize (something like $211,721.06 or even more) and you were collecting your money from the Pennsylvania State Lottery Director, Mr. Charles Kline! This will happen sometime before Friday August 13, probably in the next several *weeks*! Every time I've had these visions before, it has *always* meant a BIG CASH PAYOFF for the person involved.

*It is very important that I speak with you right away [name of recipient].* I will give you my private phone number. This is *so* important that I've made special arrangements with the phone company so you won't even have to pay any long distance charges. (I tried calling you this morning but I couldn't reach you.) This is a FREE call.

The solicitation, which is made to appear as a personalized letter, is replete with capitalized and underlined exclamations and unsubstantiated assertions such as "Normally my clients seek me out. But in your case, I was contacted by someone close to you ... I received a postcard from someone ... it was not signed, but the writer asked me to personally contact you." (*Id.*)

12. Although the solicitation by Helen Archer speaks of a personal vision ("I had a vision about you. It was very powerful. Very vivid." (Gov.Ex. 1)), Archer acknowledged at the preliminary injunction hearing that the "vision" was about a sum of money "$211,721.06" and that there was no specific vision of the person she was writing to. Instead Archer later would receive "an impulse" or "feeling" when running her fingers over a computer generated commercial mailing list that the addressee was the recipient of the generalized vision of the money.

13. Defendant's witness Mary Ray testified that she understood the language to mean that Archer actually had a vision of herself "standing next to the lottery."

14. The Postal Inspection Service has received numerous complaints and inquiries regarding the Helen Archer Promotion, including letters of complaint from Elizabeth Pitt and Bart Boyer, urging the Postal Service to prevent the defendants from using the mails for their Helen Archer Promotion. (McCarthy Aff., ¶¶ 7, 8 and 12).

15. The Inspection Service's investigation of the Helen Archer Promotion, revealed that responding recipients of the Helen Archer solicitation would receive a post card bearing the telephone number 1–800–331–2027. In response to two telephone calls from Inspector McCarthy, he was connected to the same tape recorded message instructing him to note the time of day and add the numbers together, note his age and add the numbers together, and add the numbers of his social security number in order to obtain his "lucky" numbers. (McCarthy Aff., ¶ 14, Ex. 3).

16. The fulfillment of the solicitation, (Gov.Ex. 1A), is not responsive to the solicitation (Gov.Ex. 1).

*The Helen Archer Cosmic Protector Promotion*

17. Defendants' "Helen Archer Cosmic Protector" promotion is a "back-end" solicita-

---

1. All excerpts from the solicitations are quoted as they appeared in the original documents, including the capitalization, underlining and italics used by the defendants to emphasize certain passages. The names of the recipients have been redacted.

tion aimed at consumers who respond to the Helen Archer Promotion. It offers responding consumers a "unique solar-energized, astral-tuned reckoning device as your silent protector" which defendants claim can be used to "erase evil actions" against the consumer. In addition, defendants offer a publication entitled "How to Use Your Cosmic Protector" (8 pages). (*See* Gov.Exs. 2, 2A and 2B).

18. The Helen Archer Cosmic Protector solicitation is again designed to appear as a personalized letter complete with several personalized notes from "Helen" in faux script. For example, next to the recipient's address, the words *Extremely Urgent*! are "written." It further represents that Helen Archer "had a frightening vision." The solicitation states:

> I suspect someone is trying to prevent you from enjoying all of life's riches. Someone may be holding a grudge against you. In fact, [name of recipient], I believe more than one person does not have your best interests at heart—possibly a friend or relative that you have trusted faithfully. This jealous, greedy person would love to take your new found wealth away from you, and keep you from enjoying the joy and happiness you truly deserve.

The solicitation continues to "warn" the recipient of the impending doom that awaits if she or he does not seek Archer's assistance.

19. In his investigation, Inspector McCarthy determined that there is no response to this back-end solicitation and that consumers receive nothing in return for a $15.00 payment. The postal service received a letter from Michael Levine, counsel for the defendants, dated January 4, 1994, in which Mr. Levine explained "With respect to the Helen Archer–Cosmic Protector solicitation, the product referred t[o] therein consists of a publication which is presently being printed. I have instructed my client to forward a copy of the same to me as soon as it comes off the press and I will forward a copy of the same to you at that time." (McCarthy Aff., ¶ 21, Ex. 24).

20. Defendants had nothing to offer consumers who responded to their "urgent" solicitation, despite the representation that the recipient can be protected by means of the "Cosmic Protector," from those whom they allege are conspiring against them.

21. At the preliminary injunction hearing, defendants introduced the "Cosmic Protector," the device that defendants assert "will help you to surround yourself with only honorable people and keep you from being victimized by the troublemakers lurking in your future." In fact this device is nothing but an ordinary calculator. (Gov.Ex. 2).

22. The Government introduced Dr. William George Roll, as an expert witness. Dr. Roll holds a Ph.D. from Lund University, Sweden, in philosophy, a Bachelor's and a Masters degree in literature, from Oxford University, England, and a Bachelor of Arts degree in philosophy, from the University of California, Berkeley. More importantly for this case, Dr. Roll has held a number of professional appointments in the area of psychic phenomena, including Project Director at the Parapsychology Laboratory, Duke University, and has published numerous books and articles on psychology, parapsychology and physical research. The court finds Dr. Roll's testimony credible. In his opinion nothing in his experience or the clinical evidence he has read supports the claims of Archer that she can connect with a large number of people psychically in a short period of time.

23. The court makes no finding with respect to Archer's belief in planetology, numerology, tarot cards or psychic phenomena. However, based on the court's observations of Archer on the witness stand and the explanations she has given with respect to the solicitations she wrote, the court finds her testimony incredible.

*The Uri Giller, Psychic Mentalist Promotion*

24. In faux written script, this solicitation states "*I'm going to send you real money in the mail—you have at least $14,701.00 waiting for you! No tricks. This is for real!*" In fact the only money mailed to the addressee is $1.00—something that is never mentioned. Archer testified, unpersuasively, that she wanted the $1.00 sent so that the recipient would receive something from her that was "energized."

25. Defendants' "Uri Giller, Psychic Mentalist" promotion is comprised of a faux personal communication guaranteeing responding recipients large sums of money. The mail solicitation represents that there is a natural person named "Uri Giller" a/k/a "The Amazing Giller," a psychic mentalist, "whose clients include noted celebrities including former President George Bush," and that Giller has personally written to the recipient to offer him or her the opportunity to purchase the Uri Giller product. The solicitation requests a post-dated check, in the amount of $20.00, and a strand of hair. (*See* Gov.Exs. 3 and 3A ("Uri Giller's Psychic Future Reading for Robert G. DeMuro")).

26. The fulfillment to the solicitation (Gov.Ex. 3), is a computerized tarot card reading. (Gov.Ex. 3a). The solicitation does not mention anything about a tarot card reading and the fulfillment is not in response to the solicitation.

27. Despite the similarity in names, Uri Giller is not the noted mentalist, Uri Geller. In fact, Uri Giller is simply one of many pseudonyms for defendant Weingold that he uses for his solicitations. The Giller solicitation, represents that "I am Uri Giller, better known as 'The Amazing Giller,' acclaimed Psychic Mentalist. Business leaders, movie stars, politicians, and everyday people all over the world use my insights and my energies ..." Defendant Weingold used his corporation Helen Archer, Inc. to file a certificate of assumed name for "Uri Giller Astrology" with the Department of State of New York on August 6, 1993. (*See* Def's ex. S). It is signed by defendant, not using his name of Weingold, but rather another assumed name, that of "Harold P. Wellington."

28. Helen Archer drafted the Uri Giller solicitation (Gov. Ex. 3). Although Archer was aware of the world famous (with an apparently tarnished reputation) Uri Geller, she testified that she was not trying to play off the Geller name but wanted a masculine name for marketing purposes and that the name came to her when she was in a meditative state. The Court carefully observed Archer as she testified about the coincidence of the names. Quite frankly her explanation is simply not credible. That conclusion is based not only on the inherent unbelievability of the story but also her demeanor while testifying. Neither did the balance of Archer's explanations with respect to the Giller solicitation make any more sense.

29. Plaintiff's expert witness, Dr. Roll, testified that Uri Geller was a psychic performer, that research reports publicized that his reputation was mixed, that there was support for the belief that he did in fact show genuine psychic abilities under controlled conditions, and that he was very widely publicized. Dr. Roll further stated that in recent years Mr. Geller was not widely publicized.

30. The postal service has investigated numerous complaints which almost uniformly state that their post-dated checks were cashed almost immediately, despite the post-date, and that there was some confusion between the name "Uri Giller" and the famous psychic, Uri Geller. (McCarthy Aff., ¶¶ 26–29).

31. The "Uri Giller" name used in the solicitation is intentionally deceptively similar to the name "Uri Geller." Weingold acknowledged at the preliminary injunction hearing and in his deposition testimony that he was aware of the existence of the psychic, Uri Geller, but that "Giller" and "Galler" are merely "DBAs." (Weingold Dep.Tr., Oct. 20, 1993, at 76:2–4). When he was contacted by the Postal Service, the real Uri Geller denied any affiliation with the defendants.

*The Future Forecasters Corp. Promotion*

32. The Defendants' "Future Forecasters Corp." promotion represents that a group of psychics are conducting a controversial experiment to focus on a single individual in the recipient's area, which happens to be the recipient. Responding recipients are sent a personalized "Project X–711" research file that guarantees that the recipients will receive over $9000.00 in cash and further guarantees that a "secret formula" produces an "ultimate 93% chance of winning" a lottery. The promotion claims that someone named "Uri Galler, Director Paranormal Studies" actually confirmed the recipient's "hot lotto numbers," using defendants' "secret formula." Consumers are directed to send $20.00 to the 117 W. Mt. Pleasant Avenue address

to receive their "personalized research file and secret formula 'hot lotto numbers.'" The research file is actually a copy of a portion of a book entitled Modern *Numerology, the Last Word on Numbers,* by Morris C. Goodman. (*See* Gov.Exs. 4, 4A and 9A, and McCarthy Aff., ¶ 38).

33. Helen Archer drafted the solicitation for Future Forecasters. It is signed by "Professor H.P. Wellington." Professor Wellington is of course the defendant Dr. Weingold. Dr. Weingold filed a business certificate to the effect that he is conducting business under the name of "Dr. H.P. Wellington Publishing." The certificate is signed "Harold P. Weingold a/k/a Dr. H.P. Wellington." It was filed in the County of New York and with the Essex County Clerk in 1991.

34. One of the solicitations, the Governments' Exhibit 4, is addressed to Neil Cofino, who testified at the preliminary injunction hearing. It states as follows:

My name is Professor H.P. Wellington and I am the President of the Future Forecasters. Neil, suppose I told you that there is at least $9770 in cash waiting for you! And what if I said you will receive this money sometime before the end of next month . . .

This fact was confirmed in a panel discussion between our psychic research experts here at the Center (By the way these are world-renowned psychics, mentalists and metaphysical technicians).

This portion of the solicitation was written by Archer.

35. At the preliminary injunction hearing, Archer testified that the Center, referenced in paragraph 33 above, was in Tibet, that the psychic researchers were in the "astral plain," where the research itself was conducted, and that the seven psychics joined their subconscious minds through "mental telepathy" in order to communicate and that:

while each was sitting in their own private cubicle, they were instructed to write down the name of the individual they had focused on. They were then instructed to jot down any important or unusual details of their vision . . .

Archer testified that it was entirely a psychic phenomenon taking place "here at the Center." Archer could not identify the seven psychic researchers.

36. No where in the solicitation does the reader know that the "Center" exists only on the "astral plain" and that the researchers are not identified or identifiable.

37. The solicitation reads that the psychic researchers were conducted through Future Forecasters under the aegis of Professor H.P. Wellington. As a matter of fact the language is entirely the production of Archer. Defendant Weingold attempted to distance himself from this by testifying that Archer did not tell him that the experiment would take place "in the astral zone." Defendant Weingold did not make any attempt to determine the facticity of the representations he was putting into the solicitation.

38. Although Archer wrote the body of the solicitation, defendant Weingold wrote the *P.S.* contained at the end of the document. The first sentence of the *P.S.* reads: "As I was writing this letter, our Deputy Director of Paranormal Studies, Mr. Uri Galler, informed me of another surprising fact . . ." Weingold testified that the name "Galler" was a typographical error and that it should have read Giller. Nevertheless, the statement is inaccurate since Uri Giller is of course Weingold who is Dr. Wellington. There is in fact no person named Giller or Galler who is "our Deputy Director of Paranormal Studies." If any studies were being conducted they were being conducted by Archer, according to her testimony, in an out of the body experience in Tibet. The reader does not know that the purported author, Dr. Wellington, is in fact the same person as Uri Giller—that is, unbeknownst to the recipient, Wellington is talking to and quoting himself in the solicitation.

39. Although the solicitation talks about psychic research and states that "As soon as I have your ok, we will complete the experiment," the actual fulfillment (Gov.Ex. 4A), has nothing to do with psychic research but rather is a tract on numerology, the "Project X–711" research file.

40. In response to the Postal Services Demand Test Purchase, which it performed for all of the subject promotions, Defendants provided the same "Project X–711" research file booklet which represents that the number "9770" was seen in relation to the recipient's name and in conjunction with a large amount of cash. (McCarthy Aff., ¶ 41). All the reports were the same. (*Id.*)

*The Holy Trinity Society, Inc., Promotion*

41. Defendants' "Holy Trinity Society, Inc.," promotion offers a personalized communication from a natural person named "Wilkerson." Wilkerson tells a tale of having received a pendant with the image of the Virgin Mary from an "old man." According to the solicitation, the "secret power" of the pendant had provided the old man with good fortune and was now requiring him to pass it on to another person. Wilkerson claims to be its current owner and offers to provide it to the recipients of the solicitation for the "token sum" of $20.00. Defendants guarantee that all responding consumers will receive at least one "miracle" within six months, or they will refund the money. (*See* Exs. 5 and 5A and McCarthy Aff., ¶ 45–51).

42. The solicitation tells the tale of a broken man who had, among other problems, a 15 year old daughter on drugs, a credit card debt of over $22,000, a failing marriage, "no peace, no happiness, no love, and no money." The solicitation indicates that Paul Wilkerson (a/k/a Defendant Dr. Harold Peter Weingold, a/k/a H.P. Wellington, a/k/a "The Lottery Doctor," a/k/a Dr. Paul Zax, Jr., a/k/a Uri Giller a/k/a, Uri Galler, among others), was on the verge of committing suicide when an old man gave him the tear drop pendant, which apparently gave him the power to win money at the racetrack, "a substantial lotto prize," and receive other "miracles."

43. Weingold acknowledged at the preliminary injunction hearing that the statements in the solicitation (Gov.Ex. 5) were not literally true: his daughter was not fifteen and on drugs, but in her thirties and had been on drugs; he did not "live in a tiny, broken down apartment," but in a luxury home. The statements in the solicitation, according to Weingold, were in effect a literary expression of the depression he was experiencing several years ago.

44. The Court carefully observed Weingold during the narration of his suicidal episode and the mysterious man with the golden pendant of the Virgin Mary. The manner in which Weingold narrated the story, his demeanor, and the aftermath resulting in Weingold's having replicas of the pendant made by Nat Nussbaum under Weingold's corporation, Holy Trinity Society, Inc., convinces this Court that there is only one fitting description of this testimony: humbug.

45. The solicitation states in faux script, that "*Pope John Paul II owes his LIFE to this awesome power. Now I want you to have it. P.W.* [Paul Wilkerson]." (Gov.Ex. 5). In his deposition testimony and at the preliminary injunction hearing, Weingold insists that a careful reading demonstrates that the solicitation is not saying that Pope John Paul II owes his life to the pendant but to the intercessory power of the Virgin Mary.

46. Weingold refers to the isolated snippets where the solicitation speaks of "power," and "your Sacred Virgin Mary Teardrop" as demonstrating that he is not representing that he is selling his pendant but the power represented by the pendant. The explanation is unpersuasive. A reading of this solicitation as a whole would lead the consumer to believe that the solicitation is representing that the pendant being sold has demonstrable miraculous power. This assertion is expressly supported by such language as "Joseph, the power of the Sacred Virgin Mary Teardrop can be the answer to your prayers," and "[a]lso I have reason to believe that once you *have* received the miracles you seek, you in turn, will pass on the power of the golden pendant to another deserving person—as I am now." (*Id.*)

47. The solicitation further states that "[t]he uncountable number of testimonials—including that of Pope John, II himself—along with all the other miracles mentioned above are formal, indisputable *proof* that the Sacred Virgin Mary Tear Drop has real and miraculous beneficial life-changing power." (Gov.Ex. 5). Defendant Weingold testified that this statement refers to "all the testimonials of religious people who believe in mira-

cles, who believe in the Virgin Mary, who believe in God, who have a religious reverence for life," but does not refer to any testimonials about the pendant itself. (Weingold Dep.Tr., Feb. 7, 1994, at 64:19–25).

48. In his testimony, Defendant Weingold represented that there is, in fact, only one pendant, and that he wears it. The pendants he offers through the solicitation are all inexpensive costume jewelry reproductions which change color when touched. (*See* McCarthy Aff., ¶ 51). Moreover, Weingold stated that there is no such person as Paul Wilkerson, and that he created the name, as he had with numerous other pseudonyms, because it projected a "culturally neutral" image to the consuming public. In addition, Weingold represented that he has no affiliation with the Catholic Church or any other religious entity, contrary to the very name of the corporation he adopted as a trade name, "Holy Trinity, Inc."

*The Winners' Network Promotion*

49. Defendants' "Winners' Network" promotion offers the consuming public a "super ticket," which will provide a "guaranteed ultimate 93% certainty of winning!!!" to all responding consumers. (*See* Gov.Exs. 6). The "super ticket" promoted in the solicitation claims to allow the recipient to play all 35 U.S. lotteries, in addition to lotteries in Canada, Australia, Hong Kong and Germany weekly. Defendants provide only a "how to" publication to responding consumers, however, instructing them in the establishment and use of a pyramid progression 15,000 member lottery pool in 33 different states. (*See* Gov. Exs. 6 and 6A and McCarthy Aff., ¶ 53–59).

50. The solicitation states as follows:

The '*Super ticket*' make [sic] it possible to play all 35 U.S. Lotteries plus Canada, Australia, Hong Kong and Germany ... the pay out is a staggering $150,000,000 weekly—and you [name of recipient] have a guaranteed ultimate 93% chance of winning! The '*Super Ticket*' comes with a 93% win guarantee. People who use the '*Super Ticket*' with all its power only lose 7% of the time.

If you [name of recipient] turn out to be one of those unlucky 7, we will give you double your money back.

51. Although the solicitation indicates that the recipient will be joining a lottery pool, the actual fulfillment of the solicitation is a publication entitled "The Doctor's Super Ticket," which explains how to develop a lottery pool. (Ex. 6A) The fulfillment has no relation to the solicitation. Dr. Paul Shaman, Professor of Statistics at the University of Pennsylvania, credibly testified on behalf of the Government. Without duplicating his analysis here, his conclusion regarding Weingold's "93% win guarantee" was that Weingold's claim is "valid under a specific set of conditions.... This set of conditions is either difficult or impossible to attain, and the claim is of questionable utility to the consumer." (Gov.Ex. 110).

52. Government witness, Neil Cofino, credibly testified that he received the Winners' Network solicitation (Gov.Ex. 6), in the mail, that he paid the $20.00 fee, but received nothing in response. When he requested a refund on March 19, 1993, he received in July a duplicate of the solicitation which was later followed, not by a refund, but by a solicitation from Archer (Gov.Ex. 1). Paying the requested fee of $20.00, he received a card with Archer's number, dialed it, believing that she would reveal the numbers mentioned in the letter. Hearing only the recorded message, he requested a refund for that solicitation as well. What Cofino ultimately received, was neither of the requested refunds, but yet another letter, this one for processing a refund. (Gov.Ex. 121).

53. The refund processing letter was mailed by Weingold's company, Tower Mailroom, Inc., stating that "the doctor's policy on refunds is simple. You want a refund, you get a refund." (Gov.Ex. 121). The letter requested a copy of the front and back of the canceled check, return of the publications received and completion of an enclosed form. (*Id.*) The letter suggested that instead of a refund, "you could keep the doctor's booklet and we would send you any two (2) of the Doctor's upcoming publications free of charge." (*Id.*) This suggestion is followed by five possible publications from which to choose. It was not until December of 1993

or January of 1994, that Cofino finally received his requested refund.

*The Paul Zax Jr., Promotion*

54. Defendants' "Paul Zax" promotion represents that Paul Zax, Jr., a Professor of Advanced Mathematics and Computer Science, is "highly visible" in the academic community and published in "42" scientific journals. This fictitious character is supposedly further credited with "The Professor's Winning Que" lottery device and "secret formula." Defendants guarantee that responding consumers will win at least $1,900.00 in a state lottery using the device and secret formula. The solicitation provides an assurance that recipients have a 93.16% chance of winning. The picture of Paul Zax, Jr., is actually a picture defendant Weingold, who claims to have obtained a Ph.D. in clinical psychology from Louisiana State University in 1968, and who has never obtained a degree in advanced mathematics or computer science. (*See* Exs. 9, 9A entitled "The Doctor's Winning Que," and 9B, and the McCarthy Aff., ¶ 72).

55. The solicitation specifically cites examples of lottery winners, who, according to Weingold, won the lottery because his "secret formula was used." In fact, the winning individuals have attested to the fact that they did not use Weingold/Zax's "secret formula." The testimonials include members of the Barrington, Ill., Police Department, representing that they won the Illinois State Lottery using the Zax fulfillment. (McCarthy Aff., ¶¶ 72–74). Chief Edgar W. Fair, of the Barrington, Ill., Police Department, who testified at the preliminary injunction hearing, stated that in May of 1989, sixteen employees of the Barrington, Ill., Police Department, including himself, won $8.3 million in the Illinois State Lottery. Chief Fair further stated that the officers did not use any lottery device, and that he had never heard of the defendants or Paul Zax, Jr. (*Id.,* ¶ 74 and Ex. 34).

56. The solicitation states that the "winning formula GUARANTEES payouts from $522.00 to $1942.00 per ticket if only some of your numbers are correct—and pays off 7 times more than this if you use certain numbers I reveal to you!"

57. In return for $20.00, the responding recipient receives the "Odds Improvement Maximizer" and "The Professor's Winning Que." (Gov.Ex. 9A; McCarthy Aff., ¶ 74). The Government's expert, Dr. Paul Shaman, who the Court found to be more persuasive than the defendants' expert, Dr. Weinberger, submitted a separate report with respect to his analysis of the Zax solicitation and the fulfillment. In his opinion, the guarantee that a person would positively win a cash lottery prize before October 16, 1993, using the "secret formula," of Dr. Zax was: "utter nonsense," because "[n]o system of betting that does not require selection of all possible sets of numbers can guarantee that one will "positively win a cash lottery prize." Moreover, "the claim of 93.16% chance of winning is certainly not credible for any lottery" with a "positive expected gain for the player." (Gov.Ex. 109). Even the defendants' expert, Dr. Weinberger, acknowledged that the payouts could not be guaranteed.

*The Pot'O Gold Club Promotion*

58. Defendants' "Pot'O Gold Club" solicitation, run by Fight Back International, a New York corporation, offers a voucher number and a facsimile check in the amount of $25,000.00, in the recipient's name, signed by H.P. Wellington (a/k/a defendant Weingold). The promotion suggests that the recipient is a "Cash Prize Winner," and that the recipient will receive their cash prize as soon as the consumer's $7.00 to $15.00 response is received. In actuality, responding recipients are only to receive a check in the amount of $.40 and will, in fact not receive the $.40 until December of 1995. (*See* Ex. 7; McCarthy Aff., ¶¶ 61–63; and Weingold Dep.Tr., Oct. 20, 1993, at 24:2–12). Weingold has testified that none of the responding consumers have received the $.40. (Weingold Dep.Tr., Oct. 20, 1993, at 24:13–16).

59. The solicitation states "It's official. *You're going to get the money!* No tricks and no gimmicks. Our Prize Committee has selected the 001081354 Voucher Number above and if you return the Winning number before the deadline date *you are the big $25,000.00 winner!*" The solicitation indicates that the recipient need do nothing more

than send the number back in order to get a real version of the facsimile check. The genuine article, however, would never be forthcoming. It was never the intent of the defendants to pay the amount indicated in the facsimile check to anyone.

60. The Postal Service received numerous complaints and inquiries regarding this promotion. Joseph W. Braun indicated that he had read the mailer carefully several times and was convinced that the $25,000.00 was his. (McCarthy Aff., ¶ 64). In reality, Defendant Weingold never intended to send responding consumers any more than $.40, as demonstrated by the fact that he maintains no records of the number of responding recipients, which would be necessary if he were to obey the rules articulated in fine print on the reverse side of the solicitation. (Id., ¶ 66). In addition, Weingold has testified that he intends to continue marketing this promotion "because it is a legitimate service to customers and we would like to be able to operate in New Jersey." (Weingold Dep.Tr., Oct. 20, 1993, at 34:17–23).

*The Pot'O Gold Award Promotion*

61. Defendants' "Pot'O Gold Award" promotion targets responding "Pot'O Gold Club" recipients. It offers the recipient "free gifts" in return for a $15.00 processing fee. It is never clear what, if any, "award" a responding consumer would receive in return for the $15.00 fee. (*See* Exs. 8 and 8A, entitled "Over $2,000.00 in valuable discounts with ... The Intelligent Shopper"). In fact, Ex. 8A is only a book of coupons.

*The Consumer Depot Promotion*

62. Defendants' "Consumer's Depot" promotion is a first class mail postcard representing that the recipient has previously ordered merchandise being held by the defendants. The solicitation is camouflaged as a final delivery. The postcard requests that the recipient send either $14.47 or $19.97 for shipping and handling charges for a "multi-item parcel" valued at more than $100.00 which has been set aside for the recipient. (*See* Exs. 10 and 10A).

63. Although sent to numerous recipients, all the postcards appear to bear the Final Delivery Notice No. 371187. (McCarthy Aff., ¶ 81).

64. The fulfillment of the solicitation consists of a pair of costume jewelry earrings, a gold tone chain, a small vial of perfume, a plastic item and discount coupon for Kodak film and film development. (McCarthy Aff., ¶ 82).

*The Fifth Avenue Creations Promotion*

65. Defendants' "Fifth Avenue Creations" promotion is another postcard/delivery notice representing that the recipient has previously done business with the defendants and that a valuable piece of jewelry is waiting to be delivered to the consumer upon his/her remittance of a $14.87 shipping and handling charge. (*See* Exs. 11 and 11A; McCarthy Aff., ¶ 83–84).

*General Findings*

66. Each of the enumerated solicitations, viewed in their entirety, are designed to create false impressions, mislead the recipients and manipulate the general public. Upon careful review of the materials sent through the mails, the Court concludes that solicitations show a manifest intent to deceive on the part of the defendants.

67. Both Weingold and Archer were repeatedly asked with respect to each solicitation reviewed, whether they believed any of their solicitations were untrue or intended to deceive. In light of their demeanor on the witness stand, the multiple individual and corporate personalities of Weingold, the blatant discrepancies between the solicitations and the fulfillments, the wording and overall impression of the solicitations themselves, and all of the circumstances surrounding their enterprise, the Court does not credit their disclaimer of intent to defraud.

**B. Conclusions of Law**

The United States Postal Service and the United States of America have applied to this Court for injunctive relief under 39 U.S.C. § 3007 and 18 U.S.C. § 1345, respectively. For the reasons stated below, and in light of the above factual findings, this Court will grant their application.

### 1. Title 39 U.S.C. § 3007 Injunction

The United States Postal Service alleges that the defendants' mail solicitations and promotions, described in the Court's findings of fact, constitute false representations designed to mislead the recipients and are, therefore in violation of the provisions of 39 U.S.C. § 3005.

Title 39 U.S.C. § 3005, governs the Postal Service's control over persons "engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations ... or ... engaged in a lottery, gift enterprise, or scheme for the distribution of money or of real or personal property, by lottery, chance, or drawing of any kind." The Postal Service is presently engaged in an administrative proceeding to determine whether the defendants have, in fact, violated section 3005.

■ To obtain injunctive relief under section 3007 on the grounds of false representations in violation of section 3005, the United States Postal Service must show by a preponderance of the evidence that there is probable cause to believe that the defendants' schemes are "reasonably calculated to deceive persons of ordinary prudence and comprehension." *U.S. Postal Service v. Allied Treatment, Inc.*, 730 F.Supp. 738, 739 (N.D.Tex.1990). A showing of intent to mislead is, therefore, necessary for the entry of a preliminary injunction.

Title 39 U.S.C. § 3007 provides as follows: In preparation for or during the pendency of proceedings under sections 3005 and 3006 of this title, the United States district court in the district in which the defendant receives his mail shall, upon application therefor by the Postal Service and upon a showing of *probable cause* to believe either section is being violated, enter a temporary restraining order and preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure directing the detention of the defendant's incoming mail by the postmaster pending the conclusion of the statutory proceedings and any appeal therefrom. The district court may provide in the order that the detained mail be open to examination by the defendant and such mail be delivered as is clearly not connected with the alleged unlawful activity. An action taken by a court hereunder does not affect or determine any fact at issue in the statutory proceedings.

Title 39 U.S.C. § 3007(a) (emphasis added).

The statute expressly states that entry of a preliminary injunction under section 3007 depends upon a showing by the government of probable cause to believe that section 3005 is being violated. *United States Postal Service v. Beamish*, 466 F.2d 804, 807 (3d Cir.1972). A showing of probable cause is, therefore, the "controlling substantive standard" that the Court will apply in determining whether it should issue a preliminary injunction against Weingold and the corporate defendants. *Id.* at 806.

Although section 3007 references Fed. R.Civ.P. 65, it is merely to "delineate the procedural mechanics applicable to a hearing on probable cause, the notice requirements and the form of the order." *Id.* at 806. The traditional common law standards reflected in Fed.R.Civ.P. 65, including a showing of irreparable harm, are replaced by the probable cause standard in an action under section 3007. *Id.*

■ A showing of "probable cause" requires the Government to establish a set of facts which would cause a reasonably prudent and intelligent person to believe that a cause of action under section 3005 exists. *Cf. United States v. All Right, Title & Interest*, 901 F.2d 288, 291 (2d Cir.1990). "A finding of probable cause must be based on reasonably trustworthy information." *U.S. Postal Service v. Allied Treatment, Inc.*, 730 F.Supp. 738, 739 (N.D.Tex.1990) (*citing United Postal Service v. Stimpson*, 515 F.Supp. 1149, 1150 (N.D.Fla.1981)). The Government may meet its burden of establishing probable cause by direct or circumstantial evidence, and may use hearsay in support of its application. *See United States v. 4492 South Livonia Road*, 889 F.2d 1258, 1267, 1269 (2d Cir.1989), *reh'g denied* 897 F.2d 659 (1990).

■ In order to determine whether the Government has met its burden of establishing probable cause to believe a violation of

section 3005 has occurred, it is necessary for the Court to determine what representations have been made and whether those representations are false or misleading. *See Unique Ideas, Inc. v. United States Postal Service,* 416 F.Supp. 1142, 1145 (S.D.N.Y.1976).

The Court must consider more than the literal meaning of each statement in the solicitations and promotions. *Id.* at 1145. It must also consider what the materials imply, as well as their substance and effect when viewed in their entirety. *Id.* "A court must consider the implications of an advertisement because, if it is designed to deceive the reader, an advertisement 'may be completely misleading' even if 'every sentence separately considered is literally true.'" *U.S. Postal Service v. Allied Treatment, Inc.,* 730 F.Supp. 738, 739 (N.D.Tex.1990) (quoting *Donaldson v. Read Magazine,* 333 U.S. 178, 188–89, 68 S.Ct. 591, 596–97, 92 L.Ed. 628 (1948)). "Taking an advertisement or solicitation as a whole means considering not only what it states literally, but also what it reasonably implies." *U.S. Postal Service v. Allied Treatment, Inc.,* 730 F.Supp. at 739.

It is the obligation of this Court to protect the "unwary and unsuspecting as well as the knowledgeable and worldly-wise" from any false and misleading representations contained in the defendants' solicitations. *Unique Ideas, Inc. v. United States Postal Service,* 416 F.Supp. at 1145.

■ Weingold argues that if the solicitations are carefully analyzed, there is no basis to conclude that they are misleading. For example, he claims that he did not misspeak when he wrote that the Barrington, Ill. Police Department used his "secret formula," because they, in fact, used the concept behind his formula—pooling; or again, when he said the Pope endorsed the Holy Trinity Pendant, because the Pope did, in fact, thank the Virgin Mary in a public address shortly after he was shot by a would-be assassin.

Weingold cannot hide behind a technical exegesis of consumer solicitations reminiscent of the philosophy of common law pleading. The solicitations must be read as a whole; isolated passages cannot provide immunity from all of the circumstantial evidence indicative of an intent to deceive.

The Government has introduced testimony and evidence supporting a showing that the defendants' solicitations, when viewed in their entirety and in light of the fulfillments obtained by the responding consumers, are replete with material misrepresentations intended to deceive the recipients. The misrepresentations contained in the solicitations are of the kind that warrant the imposition of a preliminary injunction.

Defendants argue that the number of satisfied customers and the refund policy used by the defendants in their solicitations belie this conclusion. The Court does not agree. Weingold introduced testimony from several witnesses expressing satisfaction with his products and services and focussed on the paucity of Government evidence on the issue. This "happy consumer" defense fails to consider, however, the complaints to the Postal Service which instigated the initial investigation, as well as the language of the letters to the defendants requesting refunds.

As in *United States v. Themy,* 624 F.2d 963, 968 (10th Cir.1980), this Court is satisfied that the Government's witnesses and exhibits demonstrate "a pattern of material and false representations intended and used as a 'come-on' to obtain money from the public through the mails ... regardless of whether the defendant hopes that responding members of the public will be satisfied with the product or service offered, and regardless of whether some members of the public are in fact satisfied." *Id.* at 968.

Moreover, the fact that the defendants had a refund program and that some of the recipients requested a refund after having been mislead by the solicitation into paying the requested fee, does not impact the conclusion that the solicitations violate 39 U.S.C. § 3005. *American Testing Institute v. U.S. Postal Service,* 579 F.Supp. 1345, 1350 (D.D.C.1984). Weingold cannot use a refund policy as a safe harbor from which to launch intentionally misleading and deceptive solicitations.

The Court concludes that the Government has proven by a preponderance of the credible evidence that there is probable cause to believe that the defendants have "engaged in

conducting a scheme or device for obtaining money or property through the mail by means of false representations." 39 U.S.C. § 3005. The Court will, therefore, enter a preliminary injunction order pursuant to 39 U.S.C. § 3007 against the defendants and in favor of the United States Postal Service.

### 2. Title 18 U.S.C. § 1345 Injunction

The United States seeks to enjoin defendants' conduct under the broader statute of 18 U.S.C. § 1345, alleging that they have violated 18 U.S.C. § 1341. Title 18 U.S.C. § 1345 provides as follows:

(a)(1) If a person is—

(A) violating or about to violate this chapter [including the mail fraud statute, 18 U.S.C. § 1341]

.　　　.　　　.　　　.

the Attorney General may commence a civil action in any Federal court to enjoin such violation.

(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 322(d) of this title), or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court to enjoin—

(A) to enjoin such alienation or disposition of property; or

(B) for a restraining order to—

(i) prohibit any person . from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

(ii) appoint a temporary receiver to administer such restraining order.

(3) A permanent or temporary injunction or restraining order shall be granted without bond.

(b) The Court shall proceed as soon as practical to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

Title 18 U.S.C. § 1345.

In compliance with 18 U.S.C. § 1345(b), this Court heard this matter as soon as the Court's schedule would allow, 17 days after the parties consented to the entry of the Temporary Restraining Order and Order for Expedited Discovery. No indictment has been returned against the defendants, so the hearing was governed by the Federal Rules of Civil Procedure and the relevant provisions of the United States Code. 18 U.S.C. § 1345(b).

■ To support its application for a preliminary injunction under 18 U.S.C. § 1345, the Government must demonstrate by a preponderance of the evidence that probable cause exists to believe that the defendants are currently engaged or about to engage in a fraudulent scheme violative of 18 U.S.C. § 1341. *United States v. William Savran & Associates, Inc.*, 755 F.Supp. 1165, 1177 (E.D.N.Y.1991); *United States v. Belden*, 714 F.Supp. 42, 45–6 (N.D.N.Y.1987). Proof of irreparable harm is not necessary for the Government to obtain a preliminary injunction. *United States v. William Savran & Associates, Inc.*, 755 F.Supp. at 1178–80.

■ "Injunctive relief is authorized under section 1345 only when the alleged fraudulent scheme is ongoing and there exists a threat of continued perpetration; the statutory equitable remedy is not available for solely past violations." *Id.* at 1178. It is clear from the testimony at the preliminary injunction hearing, that defendants' mail solicitations are an ongoing concern and that only this Court's temporary restraining order prevents them from continuing their promotions. Defendant Weingold has unequivocally demonstrated his intention and desire to continue using the mails to solicit consumers for his promotions. The Court finds, therefore, that defendants' scheme is "ongoing, and therefore preliminary injunctive relief pursuant to

18 U.S.C. § 1345 is available at this juncture." *Id.* at 1178.

The Government contends that it has established probable cause to believe that the defendants have violated the mail fraud statute, 18 U.S.C. § 1341, by means of the 11 mail solicitations discussed in the above fact findings. The mail fraud statute, 18 U.S.C. § 1341, provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1000.00 or imprisoned not more than five years or·both.

18 U.S.C. § 1341.

■ In order to establish mail fraud under 18 U.S.C. § 1341, the government must show: (1) the existence of a scheme to defraud; (2) use of the mails in furtherance of the scheme to defraud; and (3) culpable participation by the defendants. *U.S. v. Cen-Card Agency/C.C.A.C.*, 724 F.Supp. 313, 316 (D.N.J.1989); *United States v. William Savran & Associates, Inc.*, 755 F.Supp. at 1180–81 (*citing United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir.), *cert. denied*, 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986).[2]

Furthermore, the Government must demonstrate "that the scheme was devised with the specific intent to defraud, ... that the use of the mails in furtherance of the scheme

was reasonably foreseeable, ... [that] the deceit must have gone to the nature of the bargain, ... that is, any nondisclosures or affirmative misrepresentations must have been material, ... [and] that some actual harm or injury was at least contemplated." *United States v. William Savran & Associates, Inc.*, 755 F.Supp. at 1180–81 (*citing United States v. Bronston*, 658 F.2d 920, 927 (2d Cir.1981) *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982)).

■ Although the Government must prove that the defendant had a specific intent to defraud, a showing of evil motive on the part of the defendant is not necessary, and such intent may be inferred through circumstantial evidence. *Savran*, 755 F.Supp. at 1181; *U.S. v. Cen–Card Agency/C.C.A.C.*, 724 F.Supp. at 317. Moreover, the Government may establish intent to defraud under section 1341 simply by showing that the defendants "made material misrepresentations of fact with reckless disregard to their truth or falsity." *Id.*, at 316–17.

■ The Court concludes that the Government has demonstrated probable cause to believe that the defendant "is engaged or about to engage in" mail fraud violative of 18 U.S.C. § 1341, and therefore is entitled to a preliminary injunction. 18 U.S.C. § 1345; *Savran*, 755 F.Supp. at· 1181.

Defendants' argument regarding the existence of a refund policy is, as with the 39 U.S.C. §§ 3005 and 3007 action, unmeritorious. In the *Savran* case, the district court, found, as does this Court here, that:

The unconditional refund offer does not ameliorate this situation ... [I]t is reasonable to infer that only a small percentage of unsatisfied consumers even requested a refund, so that the defendant is able to retain many of the [fee] payments sent by customers who, after receiving the [fulfillment], do not go to the next step.

---

2. *United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir.), *cert. denied*, 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986) was indirectly overruled on other grounds by *Ingber v. Enzor*, 841 F.2d 450, 453 (2d Cir.1988), which recognized that the Second Circuit precedents, including *Rodolitz*, governing the Government's requirements for proving *criminal* violations of the mail fraud statute were overruled by *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which required proof of injury related to property or money, rather than "intangible" rights.

*Savran,* 755 F.Supp. at 1177. The Court has considered the existence of defendants' refund policy in making its determination, but finds, contrary to defendants' initial assertions, that it is not dispositive. The Court will, therefore, issue the injunction under 18 U.S.C. § 1345, as well as under 39 U.S.C. § 3007.

In their closing argument, defendants disingenuously argued that this case is about the "beliefs" of the defendants and members of the consuming public. The Government here is not trying to censor any beliefs; quite to the contrary, the Government's purpose here is to protect the public from deceptive solicitations. This case is not about the First Amendment, but about fraud. As the Third Circuit has recognized, defendants possess "no constitutional right to disseminate false or misleading materials." *United States v. Beamish,* 466 F.2d at 806.

*3. Scope of the Preliminary Injunction*

In light of the above factual findings and conclusions of law, the Court will issue a preliminary injunction pursuant to 39 U.S.C. § 3007, 18 U.S.C. § 1345 and Fed.R.Civ.P. 65. A district court may not issue an injunction that is broader than necessary to restrain the unlawful conduct and must give the party to be enjoined "fair and precisely drawn notice of what the injunction actually prohibits." *Educational Testing Services v. Katzman,* 793 F.2d 533, 544–45 (3d Cir.1986). The Court has an obligation, therefore, to ensure that the injunction it issues is not overbroad.

The Government is seeking the following injunctive relief:

1. directing the Postal Service to detain all of the defendants' incoming mail addressed to:

    117 W. Mt. Pleasant Avenue

    Livingston, New Jersey 07039

    434 Ridgedale Avenue, Dept. 11–188

    East Hanover, New Jersey 07936

    627 Eagle Rock Road

    West Orange, New Jersey 07052

or any other address at which the defendants currently receive mail, subject to the defendants' right to examine the wrapper of such detained mail and have delivery of any business or corporate mail that clearly has no connection to the solicitations described in the Government's papers in [support] of this application, or any other mail not sent by consumers concerning or responding to defendants' promotions;

2. directing the Postal Service to detain all of the defendants' incoming mail responsive to solicitations [described in the Government's papers in support of this application] and substantially similar to those that are the subject of this action, subject to the defendants' right to examine the wrapper of such detained mail and have delivery of any business or corporate mail that clearly has no connection either to the solicitations described in the Government's papers in support of this application or to substantially similar solicitations, or any other mail not sent by consumers concerning or responding to defendants' solicitations;

3(1). Enjoining and restraining the defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs from using the United States mails or causing others to use the mails to distribute the advertisements, solicitations, and promotional materials which are the subject of this action; any other substantially similar advertisements, solicitations, and promotional materials; or other false and misleading advertisements, solicitations, or promotional materials;

3(2). Enjoining and restraining the defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs from using the telephone, television or other broadcast medium, or causing others to use the telephone, television or other broadcast medium, to distribute the advertisements, solicitations and promotional materials which are the subject of this action; any other substantially similar advertisements, solicitations, and promotional materials; or other false and misleading advertisements, solicitations, or promotional materials;

3(3). Enjoining and restraining the defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs from using newspapers, magazines and any other print medium, or causing others to use the newspapers, magazines and any other print medium, to distribute the advertisements, solicitations and promotional materials which are the subject of this action; any other substantially similar advertisements, solicitations, and promotional materials; or other false and misleading advertisements, solicitations, or promotional materials;

3(4). Enjoining and restraining the defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs from spending, transferring or otherwise disposing of monies or property, including mailing lists, which were obtained or developed as a result of promotional materials; or any other false [or] misleading advertisements, solicitations or promotional materials; except insofar as such monies or properties are used to pay refunds and such payments are documented and certified as such to the Court;

3(5). Enjoining and restraining the defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs from selling or offering for sale any lists of consumers or mailing lists of any type compiled from consumers who have responded to their fraudulent promotions.

(Governments' Order Granting Preliminary Injunctive Relief ("Gov'ts' Inj."), ¶¶ 1–3(5)).

Pursuant to 39 U.S.C. § 3007, upon a showing of probable cause to believe that 39 U.S.C. § 3005 is being violated, the preliminary injunction entered by the Court is to direct "the detention of the defendants' incoming mail by the postmaster pending the conclusion of the statutory proceedings and any appeal therefrom." 39 U.S.C. § 3007. Furthermore, "the district court may provide in the order that the detained mail be open to examination by the defendant and such mail be delivered as is clearly not connected with the alleged unlawful activity." 39

U.S.C. § 3007. The Court finds that the relief requested by the Government in paragraphs 1 and 2 above, complies with the articulated requirements of 39 U.S.C. § 3007.

Title 18 U.S.C. § 1345 allows the Government to obtain broader injunctive relief against the defendants than the Postal Service statute. The Government apparently relies upon section 1345 to obtain the relief requested in paragraphs 3(1) through 3(5), above. In these paragraphs, the Government is asking this Court to enjoin the defendants from: (1) using the mails to distribute their fraudulent promotions; (2) using the broadcast media, including television, telephone and radio, to distribute their fraudulent promotions; (3) using any print medium, including magazines and newspapers, to distribute their fraudulent promotions; (4) transferring or disposing of monies or property related to the promotions; and (5) selling any of their mailing or consumer lists. (Gov'ts' Inj., ¶¶ 3(1)–3(5)).

Title 18 U.S.C. § 1345(a)(1)(B) specifically allows the federal courts to enjoin the violation with which defendants are charged. The Government has sustained its burden of proving probable cause to believe that the defendants have participated in a scheme to defraud and knowingly used the mails to further the scheme in violation of 18 U.S.C. § 1341. The Court, therefore, has the power to enjoin that violation. The Court, therefore, will grant this part of the injunction under 18 U.S.C. § 1345(a)(1)(B).

■ Paragraphs 3(2) and 3(3), involve enjoining defendants from using other media to continue their promotions. Such an injunction does not strictly fall under the parameters of 18 U.S.C. § 1345(a)(1)(B), as they are not mail fraud violations. Similarly, paragraphs 3(4) and 3(5), enjoining the defendants from transferring any money or other property related to the promotions, do not clearly fall within the parameters of 18 U.S.C. § 1345.

Although 18 U.S.C. § 1345(a)(2) specifically addresses injunctions related to money and property, it appears to specify that such relief is to be applied in bank fraud cases, and fails to articulate the scope of the injunc-

tions in cases involving other types of fraud. The Court is, therefore, left to the provisions of 18 U.S.C. § 1345(a)(1), which state that "[i]f a person is ·... violating or about to violate this chapter ... the Attorney General may commence a civil action in any Federal Court to enjoin such violation."

In applying the injunction statutes, the district court in *Savran* noted that "when a court is called upon to exercise its equitable powers, it is axiomatic that it may provide whatever relief is necessary and proper to do complete justice under the circumstances between the parties." *Savran,* 755 F.Supp. at 1182 (*citing Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 298–99, 80 S.Ct. 332, 338–39, 4 L.Ed.2d 323 (1960) (Whittaker, J., dissenting); *see generally* 1 S. Symons, Pomeroy's Equity Jurisprudence § 43, at p. 57 (5th ed. 1941) ("equity is nothing more or less than ... the power and duty of the judge to do justice to the individual parties in each case").

"If the public interest is involved, 'those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'" *Savran,* 755 F.Supp. at 1182 (quoting *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946)); *see also Olde Discount Corp. v. Tupman,* 1 F.3d 202, 218–19 (3d Cir.1993) (in which the Third Circuit upheld a district court's award of equitable relief in addition to statutory relief when it was acting *"in the public interest* by restoring the status quo and ordering the return of that which rightfully belongs to the purchaser").

Section 1345 has been held to vest the federal courts with power to decree broad remedial preliminary relief. *U.S. v. Cen-Card Agency/C.C.A.C.,* 724 F.Supp. at 318 (citing *United States v. Cen-Card Agency,* 872 F.2d 414 (3d Cir.1989) (in which the Third Circuit affirmed the preliminary injunction order granted by the district court)); and *Savran,* 755 F.Supp. at 1182 (citing generally Twiss, *Boiler Room Fraud: An Operational Plan Utilizing the Injunction Against Fraud Pursuant to 18 U.S.C. § 1345,* 15 Pepp.L.Rev. 503, 539–42 (1988) (broad overview of available remedies, including, appointment of a receiver, disgorgement, restitution and freezing assets)).

The Court therefore concludes that the relief requested is appropriate to protect the public from the deceptive promotions generated by the defendants and consonant with the broad equitable powers granted to the district courts by congress in matters such as these.

## III. CONCLUSION

Because the Government has met its burden of proving probable cause to believe that the defendants' solicitations and promotions are intentionally vague, misleading, false, and in light of the precedents construing 39 U.S.C. § 3007 and 18 U.S.C. § 1345, the Court will grant the Government's application for a preliminary injunction. An appropriate order follows.

### ORDER GRANTING PRELIMINARY INJUNCTIVE RELIEF

This matter having been brought before the Court by plaintiffs, the United States of America and the United States Postal Service, for a preliminary injunction pursuant to 39 U.S.C. § 3007, 18 U.S.C. § 1345 and Fed. R.Civ.P. 65; and

The Court having considered the papers submitted in support of the preliminary injunction application by Robert M. Hanna, A.U.S.A., and the papers submitted in opposition by Michael L. Levine, Esq., counsel for the defendants, Harold P. Weingold, Helen Archer, Inc., Future Forecasters Corp., Holy Trinity Society, Inc., Winners' Network, Inc., Fight Back International, Inc., Paul Zax Enterprises and Consumer's Depot Corporation, as well as the testimony of the seventeen witnesses presented at the preliminary injunction hearing and the oral arguments of counsel; and

For the reasons stated in the Opinion of the Court filed this day; and

For good cause shown:

It is on this 4th day of March, 1994 ORDERED as follows:

1. Plaintiffs' application for a preliminary injunction pursuant to 39 U.S.C. § 3007 and 18 U.S.C. § 1345 is hereby GRANTED;

2. The Postal Service is directed to detain all of the defendants' incoming mail addressed to:

117 W. Mt. Pleasant Avenue
Livingston, New Jersey 07039
434 Ridgedale Avenue, Dept. 11–188
East Hanover, New Jersey 07936
627 Eagle Rock Road
West Orange, New Jersey 07052

or any other address at which the defendants currently receive mail, subject to the defendants' right to examine the wrapper of such detained mail and have delivery of any business or corporate mail that clearly has no connection to the solicitations described in the Government's papers in support of this application, or any other mail not sent by consumers concerning or responding to defendants' promotions;

3. The Postal Service is directed to detain all of the defendants' incoming mail responsive to solicitations described in the Court's findings of fact and conclusions of law and substantially similar to those that are the subject of this action, subject to the defendants' right to examine the wrapper of such detained mail and have delivery of any business or corporate mail that clearly has no connection either to the solicitations described in the Government's papers in support of this application or to substantially similar solicitations, or any other mail not sent by consumers concerning or responding to defendants' solicitations;

4. The defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs are hereby enjoined and restrained from using the United States mails or causing others to use the mails to distribute the advertisements, solicitations, and promotional materials which are the subject of this action; any other substantially similar advertisements, solicitations, and promotional materials; or other false and misleading advertisements, solicitations, or promotional materials;

5. The defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs are hereby enjoined and restrained from using the telephone, television or other broadcast medium, or causing others to use the telephone, television or other broadcast medium, to distribute the advertisements, solicitations and promotional materials which are the subject of this action; any other substantially similar advertisements, solicitations, and promotional materials; or other false and misleading advertisements, solicitations, or promotional materials;

6. The defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs are hereby enjoined and restrained from using newspapers, magazines and any other print medium, or causing others to use the newspapers, magazines and any other print medium, to distribute the advertisements, solicitations and promotional materials which are the subject of this action; any other substantially similar advertisements, solicitations, and promotional materials; or other false and misleading advertisements, solicitations, or promotional materials;

7. The defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs are hereby enjoined and restrained from spending, transferring or otherwise disposing of monies or property, including mailing lists, which were obtained or developed as a result of promotional materials; or any other false [or] misleading advertisements, solicitations or promotional materials; except insofar as such monies or properties are used to pay refunds and such payments are documented and certified as such to the Court;

8. The defendants and their agents, officers and employees and all persons in active concert or participation with them in their affairs are hereby enjoined and restrained from selling or offering for sale any lists of consumers or mailing lists of any type compiled from consumers who have responded to their fraudulent promotions; and

9. This preliminary injunction shall continue until further order of this Court.